IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| RAYTRANS HOLDING, INC., | : | Case No. 13-11084 (CSS) |
| | : | |
| Debtor. | : | |
| _____ | : | |
| DAVID M. KLAUDER, in his capacity | : | |
| as Chapter 7 Trustee of the | : | |
| bankruptcy estate of RAYTRANS | : | |
| HOLDINGS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | Adv. Proc. No. 15-50273 (CSS) |
| ECHO/RT HOLDINGS, LLC, | : | |
| a Delaware limited liability company | : | Related Docket No.: 82 |
| ECHO GLOBAL LOGISTICS, INC., | : | |
| a Delaware corporation, | : | |
| | : | |
| Defendants. | : | |

## OPINION[1]

**WILKS, LUKOFF & BRACEGIRDLE, LLC**
Scott B. Czerwonka
4250 Lancaster Pike, Suite 200
Wilmington, DE 19805

Counsel to Echo/RT Holdings, LLC
and Echo Global Logistics, Inc.

Dated: August 10, 2017

Sontchi, J._____

**MORRIS JAMES LLP**
Eric J. Monzo
Douglas N. Candeub
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899-2306

Special Counsel for David M. Klauder
Chapter 7 Trustee

---

[1]      "The court is not required to state findings or conclusions when ruling on a motion under Rule 12…" Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## INTRODUCTION

Before the Court is a motion to dismiss the Second Amended Complaint (the "Complaint") brought by the Chapter 7 Trustee of the above-captioned estate. The Complaint alleges preferential transfers, breach of contract, and breach of guaranty and an accounting across eight different claims. For the foregoing reasons, the Complaint is dismissed, in its entirety, as the claims are barred by either collateral estoppel or under the doctrine of *res judicata*.

## FACTUAL & PROCEDURAL BACKGROUND

### A.    The Parties

In 2004, James A. Ray formed RayTrans Distribution, Inc. ("RayTrans Distribution") as a corporation under Illinois law. RayTrans Distribution operated as a trucking services broker, serving as an intermediary between truckers and entities seeking trucking services. Additionally, RayTrans Distribution provided freight brokerage and logistical services through a series of network transportation professionals.[2]

RayTrans Distribution was affiliated with two other entities: RayTrans Trucking, LLC ("RayTrans Trucking") and Universal Trans, LLC ("UniTrans"). Specifically, RayTrans Trucking and UniTrans provided various third-party owner-operators that

---

[2] Adv. Pro. No. 15-50273, D.I. 81, ¶ 12.

specialized in flatbed, over-dimensional, van, and automobile shipments.[3]  James A. Ray formed and was the sole owner of the aforementioned entities until January 1, 2008.

In an attempt to expand the companies' geographic presence, various acquisitions were made in 2007.  First, on April 30, 2007, RayTrans Distribution acquired certain assets of H&J Services and Joe Carter Trucking, Inc. with the aim of expanding into the southern United States.[4]  On October 26, 2007, RayTrans Trucking acquired certain assets of Bricker Companies, Inc., the assets of which were transferred to RayTrans Distribution.[5]

In 2007, business and assets of Unitrans and RayTrans Trucking were intermingled with the business of RayTrans Distribution.  For the financial statements for RayTrans Distribution for the year ending December 31, 2007, assets and business of Unitrans and RayTrans Trucking were consolidated into RayTrans Distribution.[6]  Financial statements for RayTrans Distribution continued to include the assets of Unitrans and RayTrans Trucking until its business was sold to the Echo Parties in 2009.[7]

On or about January 1, 2008, James A. Ray formed Holdings to serve as a holding company, and thereafter transferred the stock of RayTrans Distribution, RayTrans Trucking, and UniTrans from himself to Holdings.  Specifically, Holdings was formed to provide corporate and administrative support for its subsidiaries, and in doing so, "charged" its subsidiaries, including that of RayTrans Distribution.   As a result of this

---

[3] *Id.* at ¶ 14.

[4] *Id.* at ¶ 16.

[5] *Id.* at ¶ 17.

[6] *Id.* at ¶ 20.

[7] *Id.* at ¶ 21.

arrangement, RayTrans Distribution accrued a "considerable" amount of intercompany debt, resulting in Holdings becoming a substantial creditor of RayTrans Distribution.[8]

**B.      The Sale of the RayTrans Distribution Business**

On June 2, 2009, an Asset Purchase Agreement (the "APA") was entered into between and among Echo/RT Holdings, LLC ("Echo/RT" and the "Purchaser"), RayTrans Distribution (the "Seller"), Holdings, James A. Ray, and Echo Global Logistics, Inc. ("Echo," and collectively with Echo/RT, the "Defendants," or the "Echo Parties").[9] Illinois law applies to the APA. The APA provided for the sale and transfer of substantially all of the assets and business of RayTrans Distribution, including those assets of Unitrans and RayTrans Trucking treated as part of RayTrans Distribution.[10] At the time of the APA, and as evidenced in the APA, Holdings owned 100% of the outstanding stock of RayTrans Distribution.

Pursuant to the APA, to ensure the continuity of business, immediately after Closing, Echo/RT agreed to offer employment to substantially all of RayTrans Distribution's employees. Additionally, the APA provided for a Consulting Agreement between Echo/RT and James A. Ray, whereby Ray would continue as a General Manager of the RayTrans Division of Echo Global Logistics.[11]

---

[8] *Id.* at ¶ 26.

[9] *Id.* at ¶ 37.

[10] *Id.* at ¶ 19, 38.

[11] *Id.* at ¶ 42.

Under the APA, the purchase price was *up to* $12,550,000.00, with the additional inclusion of assumption of current liabilities. Defendants, however, paid $5,384,069 at the time of Closing.[12] The $6.5 million balance of the APA purchase price was to be paid over the following three years, at one year intervals, dependent upon the meeting of certain minimal revenue benchmarks.[13] Certain sections of the APA addressed Echo/RT's obligation to pay the balance of the purchase price, including certain guarantees.[14]

The Trustee alleges that defendants failed to make any of the additional payments provided for under the APA after paying the $5,384,069 at closing.[15] Specifically, given the additional payments were to be paid only upon the achievement of certain revenue benchmarks, the Trustee notes that the Echo Parties did not comply with their obligation to provide monthly EBITDA statements at any time in 2010 or thereafter.[16] In light of the fact that revenue increased in the period from June 1, 2009 to May 31, 2010, the Trustee argues that the obligation to pay the first $1,333,333 installment of additional consideration was triggered.[17]

However, in late 2009, Illinois's Secretary of State commenced the procedures for administratively dissolving RayTrans Distribution; the dissolution went into effect on

---

[12] *Id.* at ¶ 45.

[13] *Id.* at ¶ 46.

[14] *Id.* at ¶ 48-54.

[15] *Id.* at ¶ 55.

[16] *Id.* at ¶ 56-59.

[17] *Id.* at ¶ 60-61.

May 14, 2010.[18]   As told by the Trustee, Echo's awareness of RayTrans Distribution's status as a dissolved company served as the basis for Echo's withholding the financial reporting and the balance of the consideration owed under the APA.  Notably, the first additional payment of the purchase price for the RayTrans Distribution business was due on June 20, 2010, twenty days after the May 31 close of the EBITDA Measurement Period.[19]   Additionally, Echo's filings with the SEC in and after 2010 ceased to provide any segregated business information regarding the performance or acquisition of the RayTrans Distribution business, including a failure to mention any obligation to pay additional consideration under the APA.[20]

## C.       The Powersource Lawsuit

In 2006, Powersource Transportation, Inc. commenced a lawsuit against UniTrans and RayTrans Trucking in Indiana state court, seeking damages of over $4 million for certain alleged business torts and contract breaches (the "Powersource Lawsuit").[21] Notably, both the consolidation of the assets of UniTrans and RayTrans Trucking into RayTrans Distribution in 2007, and their subsequent transfer to the Echo Parties in 2009 occurred without either knowledge of or disclosure to Powersource.[22]

---

[18] *Id.* at ¶ 63.

[19] *Id.* at ¶ 64-65.

[20] *Id.* at ¶ 70.

[21] *Id.* at ¶ 19.

[22] *Id.* at ¶ 38.

In November 2011, a judgment was rendered in favor of Powersource and against RayTrans Trucking and UniTrans for $1,688,072.00.[23]  After the judgment was entered, Powersource continued its attempts to collect, including a garnishment proceeding in 2012 against certain garnishee defendants in aid of execution, including Holdings, RayTrans Distribution, James A. Ray, and Echo.  At this time, the Powersource judgment remains outstanding.[24]

**D.    Debtor's $50,000 Transfer to Echo**

Notwithstanding the alleged outstanding payments owed by Echo under the APA, Holdings made one or more payments to Echo subsequent to the transfer of the RayTrans Distribution and prior to its bankruptcy filing.[25]  Specifically, in December 2012, Holdings, by wire transfer, paid $50,000 to Defendant Echo, as previously set forth in Holdings' Statement of Financial Affairs filed in connection with the bankruptcy.

The Trustee alleges that 1) Holdings was not indebted to Echo when the aforementioned transfer occurred, and, 2) nor did Echo furnish reasonably equivalent value, or any value, to Holdings in exchange for the wire transfer of $50,000.[26]

**E.    Holdings' Chapter 7 Bankruptcy**

On April 25, 2013, Holdings filed for chapter 7 bankruptcy protection.  On Holdings' Schedule F, James A. Ray listed Echo as a creditor of Holdings in connection

---

[23] *Id.* at ¶ 78.

[24] *Id.* at ¶ 80.

[25] *Id.* at ¶ 81.

[26] *Id.* at ¶ 83-84.

with unspecified obligations under the APA.[27]  The defendants were served notice of the

December 12, 2013 deadline for filing proofs of claimed, but failed to file a proof of claim.

However, Powersource was listed as a creditor, specifically, a garnishee defendant, in

Holdings' schedules.  Powersource subsequently filed a proof of claim in the main

bankruptcy proceeding for $1,958,163.52 ("Claim Number 3").[28]

As of the Petition Date, Holdings had approximately $3,126,000.00 in liabilities, all

of which were unsecured.  Assets were listed as $0.00.  Holdings also listed stock interests

in its two subsidiary companies, RayTrans Trucking and Unitrans.  It is argued that

Holdings' stock interest in RayTrans Distribution was omitted because that company was

administratively dissolved by the State of Illinois prior to the Petition Date.[29]

## F.    Chancery Court Litigation

The procedural background of the instant adversary proceeding began prior to the

Petition Date, when Spring Capital Real Estate, LLC ("Spring Capital"), a creditor of

Holdings, commenced a lawsuit in the Court of Chancery against the Echo Defendants

and RayTrans Distribution on October 31, 2012, seeking to void as fraudulent

conveyances the transfers made to defendants by Holdings and RayTrans Distribution.[30]

On April 2, 2013, Spring Capital filed an Amended Complaint, naming Holdings, James

A. Ray, and the now-defunct RayTrans Distribution as nominal defendants.

---

[27] *Id.* at ¶ 86.

[28] *Id.* at ¶ 91.

[29] *Id.* at ¶ 90.

[30] *Id.* at ¶ 92.

The Trustee, pursuant to authority granted under the Bankruptcy Code, joined the fraudulent transfer action previously commenced by Spring Capital in the Chancery Court.   On November 3, 2014, the Trustee, by amended cross-claims, asserted cross-claims against the defendants in the Chancery Court action, pursuant to De. Ch. R. 13(g), "seeking to assert the estate's interest in, and to void as fraudulent conveyances, the transfers made to defendants by Holdings under Delaware and Illinois state law that were being challenged by Spring Capital.   As recoverable by a creditor holding an unsecured claim."[31]

On December 31, 2013, the Court of Chancery dismissed Spring Capital's claims with prejudice.[32]  Following the dismissal of Spring Capital's claims, the Trustee filed a Notice of Removal on April 10, 2014, seeking to remove his claims to this Court.[33]  The Echo Defendants then filed a motion to remand the Trustee's claims back to the Court of Chancery, where they were originally filed.[34]  On June 18, 2014, this Court remanded the matter back to the Court of Chancery (the "Remand Order").[35]  Notably, in the Remand Order, this Court characterized the Trustee's attempt to remove the Chancery Claims to federal court as "a clear case of forum shopping."[36]

---

[31] *Id.* at ¶ 94.

[32] *Spring Real Estate, LLC v. Echo/RT Holdings, LLC*, 2013 WL 6916277 (Del. Ch. Dec. 31, 2013).

[33] *See* Adv. Pro. No. 14-50249, D.I. 1.

[34] Adv. Pro. No. 14-50249, D.I. 4.

[35] Adv. Pro. No. 14-50249, D.I. 14.

[36] *Id.* at ¶ 6.

On November 3, 2014, the Trustee filed Amended Cross-Claims against the Echo
Defendants.[37]    In the Trustee's Amended Cross-Claims, the same successor liability
claims that Spring Capital had raised and that the Court of Chancery had dismissed were
eliminated, but kept, albeit slightly modified, the same fraudulent transfer claims
brought by Spring Capital, under both Delaware and Illinois law,  that had also been
dismissed by the Court of Chancery.

On January 20, 2015, the Echo Defendants filed a Motion to Dismiss the Amended
Cross-Claims and Opening Brief in Support Thereof ("Motion to Dismiss").  The Echo
Defendants' Motion to Dismiss was granted on February 18, 2016, and the Court of
Chancery both dismissed the Trustee's entire Amended Cross-Claim with prejudice and
denied the Trustee's request for leave to amend (the "Dismissal Order").[38]  Notably, the
Court of Chancery found that the APA was not only supported by adequate
consideration, but that the assets transferred by RayTrans did not lack reasonably
equivalent value:

> First, the APA provided reasonably equivalent value for the assets transferred.
> Although Echo/RT paid only $6,050,000, the APA provided for a purchase price
> of up to $12,550,000, provided certain earn-outs were accomplished.  Further, the
> $11,148,009 valuation of RayTrans Distribution's assets took place on December
> 31, 2007, eighteen months before entering into the APA.  Finally, whether
> RayTrans Distribution properly allocated the proceeds of the transfer to its
> creditors is of no consequence to whether the payment received in consideration
> for its assets was reasonably equivalent in value.[39]

---

[37] D.I. 82-5, Exhibit D.

[38] *Spring Real Estate, LLC v. Echo/RT Holdings*, 2016 WL 769586 (Del. Ch. Feb. 18. 2016).

[39] *Id.* at *5 (footnotes omitted).

The Court of Chancery also found that the Trustee failed to allege adequately that RayTrans possessed any intent to defraud its creditors when it entered into the APA and subsequently transferred its assets to the Echo Defendants.[40]

On December 12, 2016, the Delaware Supreme Court rejected the appeals filed by the Trustee and Spring Capital and affirmed the Dismissal Order.[41]

While the Echo Defendants' Motion to Dismiss was pending, and before the Court of Chancery granted the Motion to Dismiss, the Trustee filed the instant adversary proceeding against the Echo Defendants on April 24, 2015. Specifically, the Complaint asserted (i) three counts for avoidance of fraudulent transfers pursuant to 11 U.S.C. §§ 548 and 550, (ii) a count for avoidance of preferential transfer pursuant to 11 U.S.C. § 547, (iii) one count for recovery of an avoided transfer pursuant to 11 U.S.C. § 550, and (iv) disallowance of all claims pursuant to 11 U.S.C. § 502(d) and (j).

Following the Court of Chancery's Dismissal Order, and subsequent affirmation by the Delaware Supreme Court, on November 7, 2016, the Trustee sought leave to amend his complaint.[42] On December 28, 2016, the Court granted the Motion to Amend and denied, without prejudice, the Echo Dismissal Motion.[43]

On January 4, 2017, the Trustee filed his Second Amended Complaint.[44] The Second Amended Complaint now asserts two counts for avoidance of fraudulent

---

[40] *Id.*

[41] *Klauder v. Echo/RT Holdings, LLC*, 2016 WL 7189917, at *1 (Del. Dec. 12, 2016).

[42] D.I. 63, 64.

[43] D.I. 80.

[44] D.I. 81.

transfers under Sections 544, 548, and 550 and added a new breach of contract claim (Count V) and a claim for attorneys' fees (Count VIII). The original breach of contract claim (Count VI) and accounting claim (Count VII) remain in the Second Amended Complaint.

## STANDARD OF REVIEW

### A.    Rule 12(b)(6)

The defendants seek dismissal of various Claims brought by the Trustee in the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable here by Federal Rule of Bankruptcy Procedure 7012, for "failure to state a claim upon which relief can be granted." Fundamentally, a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[45] As such, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[46]

With the Supreme Court's decisions in *Bell Atlantic Corp v. Twombly*[47] and *Ashcroft v. Iqbal*,[48] "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[49] Thus, "[t]o survive a motion to dismiss, a

---

[45] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993).

[46] *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

[47] 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

[48] 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

[49] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.2009).

complaint must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'"[50]  Given this heightened standard, it is insufficient to simply provide "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements. …"[51]  Accordingly, a complaint "must contain either direct or indirect allegations respecting all the material elements necessary to sustain recovery under some *viable* legal theory."[52]

Following *Twombly* and *Iqbal*, in *Fowler*, the Third Circuit articulated a two-part analysis to be applied in evaluating a complaint.[53]  First, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[54]  Second, the court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' "[55]  Additionally, the Third Circuit has instructed that "[s]ome claims will demand relatively more factual detail to satisfy this standard, while others require less."[56]

---

[50] *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

[51] *Iqbal,* 129 S.Ct. at 1949 (citing *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

[52] *Twombly,* 550 U.S. at 562, 127 S.Ct. 1955.

[53] *Fowler,* 578 F.3d at 210-11.

[54] *Id.*

[55] *Id.*

[56] *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300 (3d Cir.2010).

**B.    *Res Judicata***

This Court has previously held that, fundamentally, "[t]he essence of *res judicata*, or claim preclusion, is 'that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not to have another chance to do so.'"[57]   In the Third Circuit, "a party seeking to invoke *res judicata* must establish three elements:  (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies, and (3) a subsequent suit based on the same cause of action."[58]   Additionally, courts in the Third Circuit "may take judicial notice of another court's opinion—not for the truth of the matter asserted, but for the existence of the opinion."[59]   Furthermore, where *res judicata* is based on a state court judgment, federal courts must "give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged."[60]

**C.    Collateral Estoppel**

Collateral estoppel, derived from the constitutional protection against double jeopardy,[61] provides "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause

---

[57] *In re AMC Investors, LLC*, 524 B.R. 62, 71 (Bankr. D.Del. 2015) (quoting 47 Am.Jur.2d Judgments § 464).

[58] *McLaughlin v. Bd. Of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, No. 16-4108, 2017 WL 1325687, at *2 (3d Cir. Apr. 11, 2017) (citing *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008).

[59] *Southern Cross Overseas Agencies, Inc. v. Way Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999); *see also Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

[60] *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

[61] *In re Moran*, 413 B.R. 168, 180 (Bankr. D. Del. 2009) (citing *Green v. U.S.*, 355 U.S. 184, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957)).

of action involving a party to the first case."[62]  Specifically, "where a party seeks to rely on a state court judgment to preclude relitigation of the same issues in federal court, a federal court must look to the state law and its assessment of the collateral estoppel doctrine to determine the extent to which the state would give its own judgment collateral estoppel effect."[63]

The relevant state court judgments relied upon by the defendants were rendered in Delaware, therefore, this Court will apply Delaware law to determine whether or not collateral estoppel bars relitigation in the instant adversary proceeding.

## DISCUSSION

### A.    Counts I and II Are Barred by the Doctrine of Collateral Estoppel

Count I of the Trustee's Second Amended Complaint, alleged against all defendants, seeks avoidance of fraudulent transfers pursuant to 11 U.S.C. §§ 548 and 550. At issue is the December 2012 $50,000 wire transfer made from the Debtor to Echo Global. Count II, alleged against all defendants, seeks avoidance of fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 550.

This Court finds that Counts I and II are barred by the doctrine of collateral estoppel.  As previously mentioned, this Court will use Delaware law in the instant collateral estoppel analysis.  When determining the appropriateness of applying collateral estoppel, Delaware state courts must determine whether:

---

[62] *Id.*

[63] *Id.* at 181.

1. the issue previously decided is identical with the one presented in the action in question;

2. the prior action has been finally adjudicated on the merits;

3. the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and

4. the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[64]

With respect to Count I, under 11 U.S.C. § 548(a), the Trustee must sufficiently allege that payments made to the Echo Defendants were not made in exchange for reasonably equivalent value.[65] The Court of Chancery explicitly determined that the APA

---

[64] *Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del. 2000) (quoting *State v. Machin*, 642 A.2d 1235, 1239 (Del.Super.Ct.1993)).

[65] 11 U.S.C. § 548(a)(1)(B), [t]he trustee may avoid any transfer … of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
    (B)
        (i)       received less than a reasonably equivalent value in exchange for such transfer or obligation; and
        (ii)
            (I)     was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
            (II)    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
            (III)   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

was supported by reasonably equivalent value.[66]  Furthermore, the Court of Chancery also explicitly found that the APA did not amount to a fraudulent transfer:

> Second, the Cross–Claims are insufficient to support a reasonable inference that RayTrans Distribution intended to defraud its creditors.  Such intent can be inferred from certain factors listed in Delaware's and Illinois's fraudulent transfer statutes.  The Cross–Claims allege that the facts summarized above support the Trustee's argument that the transfer was intentionally fraudulent.  These facts, however, do not provide a sufficient basis from which the Court may infer that the APA was entered into with the intent to fraudulently transfer RayTrans Distribution's assets.  While post-transaction insolvency may suggest that a transfer is fraudulent, the transfer here was for reasonably equivalent value, and as stated, what the debtor does with the money it receives has no bearing on the adequacy of the consideration.  Further, that Holdings' or RayTrans Distribution's creditors may not have known of the APA is not itself sufficient to infer that the APA was intended to defraud RayTrans Distribution's creditors, especially where the value received was reasonably equivalent to the value of the assets sold.  **Therefore, because RayTrans Distribution had no intent to defraud its creditors and received reasonably equivalent value in return for its assets, the APA did not amount to a fraudulent transfer.[67]**

The transfer in question was made to satisfy a debt and occurred under the APA.[68]  Furthermore, Count II, under 11 U.S.C. § 544, requires the litigation of the *same* state law issues already addressed by the Court of Chancery, namely, (a) that the Debtor acted with an intent to defraud, or (b) that the Debtor transferred assets for less than reasonably equivalent value.  All elements necessary for a finding that collateral estoppel bars Counts I and II have been met by the defendants.  As such, Counts I and II are dismissed on the grounds that they are barred by the doctrine of collateral estoppel.

---

[66] *See Spring Real Estate, LLC v. Echo/RT Holdings*, 2016 WL 769586, at *5 (Del. Ch. Feb. 18, 2016).

[67] *Id.* (emphasis added).

[68] *See* D.I. 96 at p. 17 ("Indeed, the APA itself, <u>attached</u> to the Second Amended Complaint, **makes it clear that Holdings/Debtor was a guarantor under the APA.**") (footnotes omitted).

**B.    Counts III and IV are Dismissed for Failure to State a Claim**

Count III seeks avoidance of preferential transfer pursuant to 11 U.S.C. § 547 and

Count IV seeks recovery of avoided transfers pursuant to 11 U.S.C. § 550.  With respect

to Count III, Section 547 of the Bankruptcy Code allows a trustee to recover a preteition

transfer of an interest of the debtor in property:

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
>> (A) on or within 90 days before the date of the filing of the petition; or
>>
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
>> (A) the case were a case under chapter 7 of this title;
>>
>> (B) the transfer had not been made; and
>>
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.[69]

Furthermore, the trustee must prove each element by a preponderance of the

evidence.[70]

The Trustee's Complaint alleged – without any factual support – that at the time

of the transfer, the defendants were "insiders" of Holdings.[71]  The Trustee also alleged

---

[69] 11 U.S.C. § 547(b).

[70] *See In re Opus East, LLC,* 528 B.R. 30, 90 (Bankr. D. Del. 2015).

[71] D.I. 81, ¶ 131.

that the defendants were creditors of Holdings at the time of the transfer within the meaning of 11 U.S.C. § 101(10)(A).[72]  Specifically, Section 547(b)(4)(B) provides for an extended window – between ninety days and one year before the date of the filing of the petition – if such creditor at the time of such transfer was in insider.

The Code defines an "insider" of a corporate debtor as including "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor.[73]  However, "[a] party may also be considered a 'nonstatutory insider,' even without actual control of the debtor, when there is a close relationship between debtor and creditor and when transactions between them were not conducted at arm's length."[74]

The Trustee did no more than recite the word "insider" – no evidence has been given, nor facts provided, that would establish that the defendants were insiders, whether statutory or otherwise, within the meaning of the Code.  Control, as enumerated in section 101(31)(B)(iii), is the only potentially applicable part of the definition of insider that would render the defendants statutory insiders.  Delaware courts have held that "activities such as monitoring the Company's business and attending board meetings are not sufficient to show control over the day-to-day operations."[75]  The Trustee has not

---

[72] *Id.* at § 132.

[73] 11 U.S.C. § 101(31)(B).

[74] *State Street Bank and Trust Co.*, 520 B.R. at 81 (citations omitted).

[75] *Id.* (citing *In re Radnor Holdings Corp.*, 353 B.R. 820, 841 (Bankr.D.Del.2006)

argued, with specificity, any action on the part of the defendants that would result in a finding of statutory insider status. This Court finds that the defendants are not statutory insiders, as they do not fall within any of the enumerated examples defining "insider" under the Code.

With respect to non-statutory insider status, in *In re Winstar Communications, Inc.*,[76] the Third Circuit affirmed the proposition that control is unnecessary for a finding of non-statutory insider status.[77] Rather, the Third Circuit held, "the question 'is whether there is a close relationship [between the debtor and creditor] and … anything other than closeness to suggest that any transactions were not conducted at arm's length.' "[78] The transaction in question – the transfer of $50,000 – was decidedly conducted at arm's length, as it was derivative of the APA, which was not found to be deficient in any way by the Court of Chancery that would rise to the level of suggesting anything other than agreement made at arm's length. The Trustee has not alleged facts with specificity in order to meet the standard to survive a 12(b)(6) motion to dismiss. Accordingly, Count III is dismissed for failure to state a claim.

Given Counts I and II are barred by the doctrine of collateral estoppel, and Count III is dismissed for failure to state a claim, Count IV for recovery of avoided transfers cannot survive, and is dismissed by this Court as well.

---

[76] 554 F.3d 382 (3d Cir.2009).

[77] *Id.* at 396.

[78] *Id.* at 397 (quoting *In re U.S. Med.*, 531 F.3d at 1277).

C.    **Counts V, VI, VII, and VIII Are Dismissed Under *Res Judicata***

The Counts discussed herein are:

- Count V: Breach of Contract and Judicial Estoppel

- Count VI: Breach of Contract

- Count VII: Accounting

- Count VIII: Breach of Guaranty and Attorney's Fees (Against Defendant Echo)

As previously discussed, "[r]es judicata, also known as claim preclusion, applies when there has been (1) a final judgment on the merits in a prior lawsuit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action."[79]

As the judgment of a state court must have the same preclusive effect in federal court as it would have within that state's courts under the law of the state, it is necessary to look to Delaware law on *res judicata*.   In *LaPoint v. AmerisourceBergen Corp.*, the Delaware Supreme Court reiterated the relevant elements of *res judicata*:

> *Res judicata* operates to bar a claim where the following five-part test is satisfied: (1) the original court had jurisdiction over the subject matter and the parties; (2) the parties to the original action were the same as those parties, or in privity, in the case at bar; (3) the original cause of action or the issues decided was the same as the case at bar; (4) the issues in the prior action must have been decided adversely to the appellants in the case at bar; and (5) the decree in the prior action was a final decree.[80]

---

[79] *Brooks-McCollum v. Emerald Ridge Serv. Corp.*, 563 F. App'x 144, 145 (3d Cir. 2014).

[80] 970 A.2d 185, 192 (Del. 2009) (citation omitted).

Each of the elements of *res judicata* have been satisfied in the instant case, as has been more than evident through the facts and extensive Court of Chancery and Delaware Supreme Court litigation.

The parties are adversaries for purposes of *res judicata*. "Parties are adversaries if they have 'opposing interests, … interests for the preservation of which opposition is essential.'"[81] Parties are considered adverse when, "… by the pleadings, [they] are arrayed on opposite sides. Opposite sides in this sense is not restricted to the plaintiffs against the defendants, since codefendants having a controversy *inter se* may come within such a classification."[82] For the past three years, the Trustee and the defendants have been the only parties litigating – to find they were not adverse would belie the true nature of years' worth of litigation. Given that the parties are adversaries, the claims in question should be viewed in the same light as compulsory counterclaims for purposes of *res judicata*.

Furthermore, the basis of the entire adversary proceeding, and the prior Court of Chancery litigation, was the APA. Even if claims were not raised until after the state court litigation had commenced,

> [i]f the pleadings framing the issues in the first action would have permitted the raising of the issue sought to be raised in the second action, and if facts were known, *or could have been known* to the plaintiff in the second action at the time of the first action, then the claims in the second action are precluded.[83]

---

[81] *CoreStates Bank, N.A. v. Huls America, Inc.*, 173 F.3d 187, 201 (3d Cir. 1999).

[82] *Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 795 (6th Cir. 2004) (internal citations omitted).

[83] *Id.* at 193 (emphasis added and citations omitted).

Most information relied upon by the Trustee derives from public filings by the defendants.  That the Trustee might have been unaware of their public nature, due to a failure to realize that the Echo Parties were, in fact, public companies, neither renders the information any less public, nor any less accessible to the Trustee for purposes of asserting causes of action.[84]  Thus, Counts V, VI, VII, and VIII are dismissed as they are barred under *res judicata*.

## CONCLUSION

This Court, in its previous Remand Order, observed that the Trustee's attempt to remove the Chancery Claims to federal court was "a clear case of forum shopping."[85]  Such a characterization is still appropriate in the instant Adversary Proceeding.  Given that these claims, whether in their exact or slightly altered forms, have been fully litigated in the Court of Chancery, and further affirmed by the Delaware Supreme Court, the Complaint will be dismissed with prejudice in its entirety for the aforementioned reasons.  An order will be issued.

---

[84] D.I. 82 at 28.

[85] *Id.* at ¶ 6.